UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | | |
|---|---|---|
| BILOXI YACHT CLUB, INC. | § | PLAINTIFF |
| | § | |
| V. | § | NO. 1:07CV888-LG-RHW |
| | § | |
| GRAND CASINOS OF MISSISSIPPI, | § | |
| INC.–BILOXI | § | DEFENDANT |

## MEMORANDUM OPINION AND ORDER DENYING SUMMARY JUDGMENT

BEFORE THE COURT is Defendant Grand Casinos of Mississippi, Inc.–Biloxi's [52] Motion for Summary Judgment and [82] Motion to Exceed Page Limitation by sixteen pages. Plaintiff Biloxi Yacht Club, Inc., instituted this action for damages sustained when a portion of the Lady Luck gaming barge broke away from its mooring and came to rest on the Yacht Club's property, during Hurricane Katrina. Grand Casinos argues that (1) it did not negligently secure its casino barges, (2) Hurricane Katrina was an act of God, and (3) Grand Casinos did not cause Plaintiff's damages. The Court has reviewed the parties' submissions and the relevant legal authority. The motion to exceed page limitation is denied. The motion for summary judgment is denied.

### FACTS AND PROCEDURAL HISTORY

The Biloxi Yacht Club is a Mississippi corporation, with its principal place of business in Biloxi, Mississippi. The Yacht Club is located at 430 Beach Boulevard, Biloxi, which is on the north side of U.S. Highway 90. Prior to Katrina, the Yacht Club had a one story building, with a swimming pool in the back. Just behind the Yacht Club property was the Old Tivoli Hotel.

At the time of the Complaint, Grand Casinos was a Minnesota corporation, with its

principal place of business in Nevada[1]. It operated a hotel resort and casino at 280 Beach Boulevard, Biloxi. The casino was located southeast of the Yacht Club, moored just offshore in the Mississippi Sound. The casino consisted of a main barge (six individual barges welded together) and the smaller Lady Luck barge. The main barge was completed in 1994 and was collared to four mooring dolphins on the north side. The Lady Luck was completed in late 1999, and it was collared to south side of the main barge. The Lady Luck was not independently moored. Specifically, the Lady Luck had two vertical arms, each of which was collared to one of two vertical, four-feet tall pipes attached to the main barge.

During the Hurricane Katrina on August 29, 2005, the Lady Luck broke free, and the main barge became dislodged from its moorings. The Lady Luck was subjected to high winds and storm surge and eventually came to rest on the Yacht Club's property. The Lady Luck remained there until it could be demolished and removed.

The Yacht Club instituted this action for negligence, gross negligence, and negligence per se, alleging a failure to adequately secure the barges, a failure to warn, failure to inspect, and failure to implement an emergency plan. The Yacht Club alleges that the barge or barges destroyed and deprived the Yacht Club of the exclusive use and enjoyment of its property. The Yacht Club seeks, among other things, compensatory, statutory, and punitive damages, attorney's fees, pre and post judgment interest.

---

[1] Prior to 2007, Grand Casinos's principal place of business was located in Gulfport, Mississippi. On January 2, 2008, Grand Casinos changed to "Grand Casinos of Biloxi, LLC."

**DISCUSSION**

<u>STANDARD FOR MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 56:</u>

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56. To make this determination, the Court must view the evidence in the light most favorable to the non-moving party. *Abarca v. Metro. Transit. Auth.*, 404 F.3d 938, 940 (5th Cir. 2005). A "material fact" is one that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute about a material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* The party that bears the burden of proof at trial also bears the burden of proof at the summary judgment stage. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986). "[W]hen a motion for summary judgment is made and supported . . . an adverse party may not rest upon . . . mere allegations or denials . . . but . . . must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).

To prove a negligence claim, the Yacht Club must show (1) a duty or standard of care owed by Grand Casinos to the Yacht Club, (2) that Grand Casinos breached that duty, and (3) this proximately caused (4) the Yacht Club's damages. *Lyle v. Mladinich*, 584 So. 2d 397, 399 (Miss. 1991). Grand Casinos challenges whether there was a duty, breach, and whether Grand Casinos thereby caused the Yacht Club's damages.

<u>DUTY</u>

Grand Casinos argues that it had no duty to moor against a storm surge in excess of

3

fifteen feet and that the scope of Katrina was unforeseeable. The Yacht Club responds that the Mississippi Gaming Commission imposed a duty to secure the Lady Luck to withstand a Category Four hurricane, wind and wave loads associated with basic wind speeds of 130 miles per hour, and a storm surge of fifteen feet. The Yacht Club does not address whether Grand Casinos had a duty to exceed these regulations.

"Whether a duty is owed is a question of law." *Doe ex rel. Doe v. Wright Sec. Servs.*, 950 So. 2d 1076, 1079 (¶12) (Miss. Ct. App. 2007). In this case, both parties agree that Mississippi Gaming Regulation II(B)(10) outlined the duty to secure the gaming barges during a hurricane. They, however, disagree on the full interpretation of that duty. They do agree that, pursuant to Mississippi Gaming Regulation II(B)(10), the casinos were required to be moored to withstand, among other things, a fifteen-foot storm surge.

The regulation provides in part:

It is the policy of the Mississippi Gaming Commission to require, as a condition of licensure, that cruise vessels utilized for gaming on the Mississippi Gulf Coast . . . that are not self-propelled, to be moored to withstand a Category 4 hurricane with 155 mile per hour winds and 15 foot tidal surge.

MISS. GAMING REG. II(B)(10). In 1995, the Commission clarified that these vessels:

are to be moored by dolphins or other mooring devices. The design and construction shall comply with the Standard Building Code requirements. <u>ASCE-7ANSI Minimum Design Loads for Buildings and Other Structures</u>, latest version, shall be used to determine the design hurricane wind loads, using the <u>Basic Wind Speed</u> velocity of 110 miles per hour, and importance factor of 1.11, exposure category D, and gust factor and external pressure coefficients associated with the height and shape of the vessel.
    Those vessels located on the Mississippi Gulf Coast shall also include design loads associated with waves created by the Basic Wind Speed velocity of 110 miles per hour. These loads shall be calculated according to well accepted wave load analysis.
    The mooring devices shall be required to secure the vessels for the total

> hurricane wind load plus wave load as required, including a tidal surge as required
> by the Federal Emergency Management Agency (FEMA) at the permanent
> location of the vessel.

(Def.'s Mot. Summ. J. Ex. 2-4 at 1). In 1997, the Commission changed the policy to read that it should withstand a fifteen foot tidal surge and increased the "Basic Wind Speed" to 130 miles per hour and increased the importance factor to 1.15. *Id.* at 3. However, "No further upgrade will be required of previously approved moorings as the new formula does not result in major changes to the design parameters." *Id.* at 4.

BREACH

Grand Casinos next argues that there is no evidence of how it breached its duty under the gaming regulations. The Yacht Club responds that a genuine issue of material fact exists, because there is evidence that the barge(s) broke free when the storm surge was less than fifteen feet, the connection between the Lady Luck and the main casino was built to the earlier 110 miles per hour wind speed, as opposed to the 130 mile per hour winds, and the connection did not allow for applicable wind and wave loads.

First, there is evidence that the Lady Luck broke free and collided with the Yacht Club property prior to the storm surge reaching fifteen feet. For example, Plaintiff's expert Neil Hall testified that given the physical evidence at the Yacht Club's property, at the Old Tivoli Hotel, and on the Lady Luck itself, it appeared that the Lady Luck crossed Beach Boulevard and arrived on the property when the surge was between twelve to thirteen feet. There was evidence that the columns on the Yacht Club building were sheared at their base, with one that was pressed to the ground. The crush patterns on the Old Tivoli Hotel appear to match the crush patterns on the Lady Luck. Given this, it appeared that the Lady Luck came onto the Plaintiff's property when

5

there was enough water to allow it to skim near the bottom of the water/top of the land. There are also nearby tree stumps in the destruction pathway, that indicated that the trees were, too, sheared near their base. This is in contrast to the trees outside of the property line which remain standing. Given the height of the land plus the draft of the barge, Hall calculated that the barge thus crossed Beach Boulevard at twelve to thirteen feet of surge. This is evidence from which a reasonable jury could conclude that the barge was not secured to withstand fifteen feet of storm surge.

Additionally, Grand Casinos admits that the Lady Luck was built "in accordance with the SBC 110 mph, Exposure D criteria and all referenced coefficients." (Def.'s Mem. Summ. J. at 9 n.8). Moreover, Lee Mason testified that Grand Casinos considered only 100 mile per hour winds in designing the mooring structures. However, the Commission required it to be able to withstand wind and wave loads associated with "basic wind speeds" of 130 miles per hour and an increased importance factor of 1.15. Dr. David Mitchell opined that the maximum sustained winds the area experienced during Katrina were between 110 and 115 miles per hour, with maximum three second gusts under 120 miles per hour.

Grand Casinos nevertheless argues that even though it considered 110 mile per hour winds in its design, it met the 130 miles per hour wind design requirement. It maintains the Commission's 1995 clarification's "110 miles per hour" wind speed is measured by the "fastest mile" approach. According to Dr. Gordon H. Reigstad, "'Fastest mile' speed is based on the wind speed average over a one-mile length." (Reigstad Aff. at 2 (¶5)). Grand Casinos then argues that the 1997 clarification's "130 miles per hour" wind speed is measured using the three second gust approach. Grand Casinos says that 110 mile per hour wind under the fastest mile

approach equals 130 mile per hour wind under the three-second gust approach. First, this does not account for Mason's testimony that only 100 mile per hour winds were considered and Dr. Mitchell's testimony that the actual three second wind gusts experienced in Katrina never exceeded 120 miles per hour. Second, the Commission described both measurements as "basic wind speed" and did not specify whether there was a change from the fastest mile approach to the three second gust approach. Third, Hall testified, "If you go to the charts in the International Building Code to convert fastest mile to three-second gust, 110 fastest mile converts to 125, three second-gusts." (Hall Dep. at 86).

Finally, Joseph Comer testified that the connection between the two barges was too rigid to allow for rotational movement between the two barges, due to wave action caused by a Category 4 hurricane with 155 mile per hour wind and fifteen foot storm surge. He also testified that Grand Casinos was required to design for wind and wave loads in this situation, but that Grand Casinos did not. A reasonable jury could conclude that Grand Casinos breached its duty to secure the Lady Luck.

CAUSATION

Grand Casino argues "Plaintiff cannot establish that the loss of the Biloxi Yacht Club was proximately caused by any act or omission of Grand Casino Biloxi," because there is no evidence that Hurricane Katrina's winds and water would have left a structure, but for the Lady Luck running onto the property. (Def.'s Mem. Summ. J. at 27). Grand Casinsos does not address whether it caused the Yacht Club's loss of enjoyment and use of the premises. The Yacht Club responds that Dr. Hall's testimony indicates that the total destruction of its building was due solely to the Lady Luck barge.

7

To prove proximate cause, the Yacht Club must show that Grand Casinos's negligence was both the cause in fact and legal cause of the damage. *Glover v. Jackson State Univ.*, 968 So. 2d 1267, 1277 (¶31) (Miss. 2007). Cause in fact exists when "but for the defendant's negligence, the injury would not have occurred." *Id.* at (¶32).

There is evidence from which a reasonable jury could conclude that the Lady Luck was the cause in fact for the complete destruction of the Yacht Club building. For example, Dr. Hall testified that the Yacht Club building was only partially damaged from the winds and water prior to the Lady Luck coming on to its property. He opined that, absent the barge striking the building, the load bearing members would have survived and been reusable. The post-Katrina photographs of the property support a finding that the Lady Luck did at least partially damage the building.

ACT OF GOD

Grand Casinos argues that it is entitled to the act of God defense, because Katrina was an unprecedented storm, and Grand Casinos followed the Mississippi Gaming Regulations. The Yacht Club responds that this defense is not available, because Grand Casinos was negligent and this contributed to the Yacht Club's loss.

Because Grand Casinos will bear the burden of proving this affirmative defense, it "must establish 'beyond peradventure all of the essential elements of the . . . defense.'" *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). An act of God is "an injury due directly and *exclusively* to natural causes without human intervention, which could not have been prevented by the exercise of reasonable care and foresight." *City of Hattiesburg v. Hillman*, 76 So. 2d 368, 371 (Miss. 1954) (emphasis added). In other words, "[t]his defense applies where an injury is

8

attributable solely to natural cause." *Shields v. Easterling*, 676 So. 2d 293, 296 (Miss. 1996). *See also*, *Baltimore & O.R. Co. v. Johl & Bergman*, 177 So. 778, 783 (Miss. 1938) ("This is not a case where the state of the proof shows that the damage is due either to an act of God or to the carrier's negligent failure to safeguard the shipment. The evidence in this case shows that the act of God–the unprecedented flood–was the sole proximate cause of the loss.") "An act 'which may be prevented by the exercise of ordinary care is not an act of God.'" *King v. Miss. Power & Light Co.*, 142 So. 2d 222, 224-25 (Miss. 1962) (quoting *City of Hattiesburg*, 76 So. 2d at 371). "However, if the injury is caused by an Act of God, in connection with which the negligence of the defendant is a concurring cause, and the injury would not have occurred except for such negligence, then defendant is liable." *McFarland v. Entergy Miss., Inc.*, 918 So. 2d 679, 701 (¶14) (Miss. Ct. App. 2004) (rev'd by 919 So. 2d 894 (Miss. 2005).

For example, in *City of Jackson v. Brummett*, 80 So. 2d 827, 828 (Miss. 1955), an individual's private plane was parked at the city's airport. The City agreed to provide parking space and "tie-down service" for Mrs. Brummett's plane. *Id.* One day, "with very little warning, the wind velocity increased from 7 mph to 45 mph, and, . . . at the airport, there were wind gusts up to 65 miles per hour." *Id.* There was disputed evidence about whether the ropes to tie Mrs. Brummett's plane down were rotten. *Id.* The plane blew over in the wind and was damaged. *Id.* The City argued that the sole cause was an act of God in the form of "a sudden, extraordinary and unprecedented wind." *Id.* at 829. The court affirmed the verdict for the plaintiff, finding, there was evidence that:

> the damage to appellee's airplane was not due exclusively to natural causes, and that it could have been prevented by the exercise of reasonable care and foresight on the part of the City in providing adequate ropes to tie the plane down and by

9

the exercise of ordinary care in that respect.

*Id.*

As previously discussed, there is a dispute of fact as to whether Grand Casinos was negligent in the design of the barge's moorings and connections. There is also a dispute of fact as to whether this negligence contributed to the Yacht Club's loss. Therefore, Grand Casinos is not entitled to judgment as a matter of law on this defense.

**IT IS THEREFORE ORDERED AND ADJUDGED**, that for the reasons stated above, Defendant Grand Casinos of Mississippi, Inc.–Biloxi's [52] Motion for Summary Judgment is **DENIED.**

**IT IS FURTHER ORDERED AND ADJUDGED** that Defendant's [82] Motion to Exceed Page Limitation is **DENIED.**

**SO ORDERED AND ADJUDGED** this the 25th day of March, 2009.

s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE